ONE WISCONSIN NOW,

                            Plaintiff,                    OPINION AND ORDER

   v.

                                                    17-cv-0820-wmc

JESSE KREMER, JOHN NYGREN,
ROBIN VOS, in their official capacities,

                            Defendants.

---

Plaintiff One Wisconsin Now alleges that defendant Jesse Kramer, John Nygren and Robin Vos -- all elected members of the Wisconsin State Assembly -- violated the First Amendment by blocking it from their respective Twitter pages. Before the court are the parties' cross-motions for summary judgment. (Dkt. ##27, 56.) For the reasons that follow, the court will grant plaintiff's motion and deny defendants' motion for summary judgment, leaving only the question of the appropriate scope of relief under the First Amendment to be decided.

## PRELIMINARY ISSUE

Before turning to the parties' cross-motions for summary judgment, the court first addresses defendants' challenge to the testimony pf plaintiff's expert Kathleen Bartzen Culver. (Defs.' Mot. to Strike (dkt. #38).) Dr. Culver has a Ph.D. in mass communications and teaches at the University of Wisconsin's School of Journalism and Mass Communication. Defendants do not seek to strike portions of her report that fall within her area of expertise -- namely, how Twitter works -- but rather, to strike a number of paragraphs in her report, which they contend constitute inadmissible legal opinions.

Specifically, defendants challenge Culver's opinions that: (1) political speech is afforded special deference in the United States; (2) Twitter presents a public forum; (3) defendants' use of Twitter is not government speech; (4) defendants' blocking of plaintiff constitutes state action, implicating First Amendment concerns; and (5) there are lesser restrictive alternatives. (*Id.* at 3-4 (citing Culver Rept. (dkt. #26); *id.* at 4 (listing specific paragraphs defendants seek to strike).) In response, plaintiff acknowledges that Culver's testimony "occasionally and necessarily touch on the law," but argues that the "opinions are not so purely comprised of legal conclusions to be inadmissible." (Pl's Opp'n (dkt. #52) 1.)

Generally, the court agrees that portions of the testimony defendants challenge either provide context for her subsequent discussion or use the law as a framework for discussing specific features of Twitter. For example, the first sentence of paragraph 11 simply summarizes her understanding of the questions presented by the current case and, as such, provides no opinions, legal or otherwise. Paragraph 18 also describes her understanding as to how Twitter activities can constitute political speech, and while relying on this understanding of the legal framework to couch her description of Twitter activities, the thrust of her opinions concern how citizens can use Twitter to engage in political discussions. Finally, paragraph 20 provides her overview of the different types of public forums, which then guides her analysis of Twitter in paragraphs 23, 24 and 25.

All of this challenged testimony is akin to other experts who, for example, set out the *Georgia-Pacific* factors or trademark infringement factors before analyzing each one. Indeed, the court finds the *substance* of Culver's descriptions as to the different parts of Twitter, which content is controlled by the Twitter account owner versus by others, and

how an observer would understand the difference, potentially helpful and within her area of expertise. (Culver Rept. (dkt. #26) ¶¶ 27-28.)[1]  Similarly, paragraphs 30, 32-34 describe the impact of blocking, as compared to other Twitter actions like muting or setting policies controlling Twitter feed comments.  All of this also falls within her area of expertise and is helpful to the court.[2]

On the other hand, there are entire paragraphs of the report that simply describe caselaw in a way that is neither helpful to the court, nor within Culver's area of expertise. As such, the court will grant the motion -- and has not considered -- the following paragraphs:  ¶ 10 (describing the Supreme Court's holding in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017)); ¶¶ 16-17 (describing the importance of political speech and reasons for that protection espoused by Alexander Meiklejohn); and ¶¶ 21-22 (describing political speech in other contexts and the Supreme Court's recognition of social media as a forum for political speech in *Packingham*).

---

[1] Buried in these paragraphs, and others, Culver does, at times, offer her opinions on what are ultimately legal question (e.g., "These public officials' use of social media channels and the feeds specifically do not amount to 'government speech.'").  (Culver Rept. (dkt. #26) ¶ 27.)  The court agrees that this testimony is not helpful, but other parts of the same paragraph are helpful and within her area of expertise. *See Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 662 (7th Cir. 2018), *cert. denied*, No. 18-125, 2018 WL 3626102 (U.S. Nov. 5, 2018) ("Courts do not consult legal experts; they are legal experts.") (citing *United States v. Knoll*, 785 F.3d 1151, 1156 (7th Cir. 2015); Fed. R. Evid. 702(a)).  Since the court is certainly capable of discerning the difference, there would be little point, and a great deal of wasted time and energy, to attempt to excise the offending language from paragraphs containing otherwise appropriate relevant information.  Accordingly, the court will simply give no weight to Culver's legal opinions, rather than bother to do so.

[2] Here, too, Culver extends her testimony to ultimate legal questions, e.g., whether an action constitutes "state action."  (Culver Rept. (dkt. #26) ¶ 30.)  The court opts to simply ignore this impermissible extension rather than the appropriate areas of testimony in that same paragraph.

Accordingly, the court will grant in part and deny in part defendants' motion. For the purposes of deciding the parties' cross motions for summary judgment, I have not considered paragraphs 10, 16, 17, 21 and 22, nor portions of other paragraphs in which Culver opines on ultimate legal questions or otherwise misstates current law.

UNDISPUTED FACTS[3]

## A. The Parties

Plaintiff One Wisconsin Now ("OWN") is a 501(c)(4) non-profit corporation based in Madison, Wisconsin. OWN self-identifies as a liberal organization, engaged in "issue advocacy and works to promote a vision of a Wisconsin with equal economic opportunity for all." (Pls.' PFOFs (dkt. #29) ¶ 2.)

At the time the parties filed for summary judgment, defendants Jesse Kremer, John Nygren and Robin Vos were all Wisconsin State Assembly Representatives. Kremer resides in Kewaskum, Wisconsin, and represents the 59th Assembly District; Nygren resides in Marinette, Wisconsin, and represents the 89th Assembly District; and Vos resides in Burlington, Wisconsin, and represents the 63rd Assembly District. All three defendants maintain offices in Madison, Wisconsin.

## B. Twitter

### 1. Overview

Twitter is an online social media platform where users are able to "publish short

---

[3] Unless otherwise noted, the court finds the following facts to be material and undisputed for summary judgment purposes.

messages, to republish or respond to others' messages, and to interact with other Twitter users in relation to those messages." (Pls.' PFOFs (dkt. #29) ¶ 7.) The social media site has over 300 million users worldwide. There are approximately 70 million Twitter users in the United States.[4]

A Twitter user is an individual or entity who has created a Twitter account. Each Twitter user has an account name, which always consists of an "@" symbol and a unique identifier (e.g., @repvos). The account name is called a Twitter "handle." Each user also has her own timeline that displays her tweets, the date she joined Twitter, and "a button that invites other to 'Tweet to' the user." (*Id.* at ¶ 10.) The timeline may also include

> a short biographical description; a profile picture, such as a headshot; a "header" image, which appears as a banner at the top of the webpage; the user's location; a button labeled "Message," which allows two users to correspond privately; and a small sample of photographs and videos poster to the user's timeline, which link to a full gallery.

(*Id.* ¶ 11.) Provided by plaintiffs, the image below is an example of a Twitter user's timeline.

---

[4] These numbers were as of the dates of the parties' summary judgment submissions.



(*Id.* ¶ 12.)

An individual tweet can be up to 280 characters in length. In addition to the 280 characters, a tweet will contain the user's account name (which links to the user's timeline), the user's profile picture, the date and time the user generated the tweet, and the number of times other Twitter users have replied to, retweeted or liked/favorited the tweet. Tweets can also contain multimedia content such as photographs, videos and links.

### 2. Interactive Capabilities

All of a user's own tweets are displayed on the user's timeline. A user's most recent tweets are automatically published on the top of her timeline. A user can also display content from other Twitter users on her timeline by retweeting or quoting another user. If a user retweets another user, the other user's original tweet will appear on the retweeter's timeline along with the user's own tweets. The image below illustrates this concept:



(*Id.* at ¶ 9.)  Users are also able to quote other users in their own tweets.

Twitter users can directly engage with other users in several ways.  The most basic form of interaction is "following," which allows Twitter users to subscribe to other users' messages.  Users that follow another user's Twitter account (called "followers") are notified when the user they follow publishes tweets on her timeline.  Twitter users also can engage in more direct user interaction by replying to another user's tweet.  Like a tweet, a reply can contain up to 280 characters and can include photographs, videos, and links.  For instance, if User A tweets "I support candidate X," User B can reply directly to User A's tweet and say, "I disagree with you, I support candidate Y."  When User B replies to User A's tweet, the reply will appear in two places: (1) User B's timeline under a tab called "Tweets & replies" and (2) on User A's timeline in a "comment thread" under the original tweet.  Once a reply appears in a comment thread, any other Twitter user with access to User A's timeline can reply to either User A's tweet or User B's reply to the tweet.  "Other users' replies to the same tweet will appear in the same comment thread, nested below the replies to which they respond."  (*Id.* at ¶ 17.)  Another way Twitter users can engage with

each other is by "liking," also referred to as "favoriting," another user's tweet. (*See, e.g.,* Pl.'s Reply to Pl.'s PFOFs (dkt. #49) ¶ 19.) Finally, a user can mention another user in a tweet by including the other user's Twitter handle in a tweet.

The original content of these interactive mechanisms (tweets, retweets, replies, likes and mentions) are controlled by the user who generates them. No other users "can alter the content of any retweet or reply," and other users "cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts." (*Id.* at ¶ 20.)[5]

### 3. Accessibility

Generally, Twitter users' timelines are visible not only to other Twitter users, but also everyone with internet access, including non-Twitter users. While non-Twitter users can see a user's account, "they cannot interact with users on the Twitter platform and may not see tweets in real time." (*Id*. at ¶ 14.) A Twitter user can also elect to "block" another user's access to her timeline. When a Twitter user is blocked, she is no longer able to

> see, or reply to the blocking user's tweets, retweet the blocking user's tweets, view the blocking user's list of followers of followed accounts, or use the Twitter platform to search for the

---

[5] In their reply brief, defendants represented that they may delete others' tweets in addition to blocking users. (Defs.' Reply (dkt. #66) 15-16.) In response, plaintiff filed a motion to file a sur-reply addressing this argument and the proposed brief. (Dkt. ##69, 69-1.) In responding to that motion, defendants stated that they do not oppose the sur-reply and acknowledged that the "cited evidence does not support" the statement that "a user may delete a follower's reply tweet." (Defs.' Resp. (dkt. #70).) As such, the court will grant the motion to file a sur-reply and has considered the proposed brief and defendants' response. More recently, defendants filed their own motion to supplement the summary judgment record further to add plaintiff's acknowledgement in response to interrogatories that "[w]hen a Twitter user deletes one of his own tweets, to which a follower has replied, from his feed, that user's tweet and the follower's reply are removed from view on that user's feed." (Defs.' Mot. to Suppl. (dkt. #77) 2.) The court will grant this motion as well, and it has considered its import as reflected in the opinion below. *See infra* Opinion p.29 n.14s.

blocking user's tweets.

(*Id.* at ¶ 21.)

While users are not notified when they are blocked, a user can see whether she is blocked by visiting the blocking user's Twitter timeline. If blocked, the user will then "see a message indicating that the other user has blocked him or her from following the account and viewing the tweets associated with the account." (*Id.*) The following is an example of such a message:



(*Id.*)

Twitter also allows users to "mute" other users. A muted user is still able to "follow the muting user, retweet the muting user's tweets, and participate in comment threads created by the muting user." (*Id.* at ¶ 23.) However, the muting user is unable to see any of the muted user's Twitter activity that would otherwise appear on that user's timeline.

### C. The Parties' Twitter Accounts

#### 1. Plaintiff OWN's Account

OWN created its Twitter account in September 2008. The account is operated by OWN's staff under the username @onewisconsinnow. OWN's Twitter account has nearly 11,500 followers and follows over 2,200 other accounts, including the Twitter accounts of both "liberal and conservative politicians." (*Id.* at ¶ 39.)

OWN uses Twitter for several purposes. First, OWN's Twitter account allows it to "engage in speech, monitor Wisconsin's elected officials, and deliver news and analysis to the public." (*Id.* at ¶ 37.) OWN publishes several Tweets a day "almost exclusively on matters of state and federal politics and policy from a liberal perspective." (*Id.* at ¶ 38.) Second, OWN uses Twitter to "receive news of, reply to, and ask questions" about the activities of liberal and conservative politicians. (*Id.* at ¶ 39.) Specific to this lawsuit, before being blocked from the defendants' Twitter accounts, OWN would monitor, comment on, and reply to defendants' tweets, retweet defendants' tweets, and mention defendants' accounts in its own tweets.

#### 2. Defendant Kremer's Account

Kremer "operates and/or oversees the operation" of the Twitter account @RepJesseeKremer ("Kremer Account"). (*Id.* at ¶ 4.) The Kremer Account was created in January 2015. The Kremer Account has over 1,000 followers. The Kremer Account is registered to "Rep. Jesse Kremer, Official account for Wisconsin State Representative Jesse Kremer (R-Kewaskum)." (*Id.* at ¶ 28.) The account's page links to Kremer's "official legislative website . . . established by the Wisconsin Legislative Technology Services

Bureau." (*Id.*)

Kremer possesses and uses the login information for the Kremer Account. Kremer also controls the content of tweets and decides who to block. Members of Kremer's staff, in particular a research assistant, post content on the Kremer Account. Kremer's staff do so "from their offices on state time." (*Id.* at ¶ 66.)

Kremer uses Twitter to "notify the public about his public listening sessions," where members of the public can listen to Kremer "talk about things that are going on in Madison" and share their ideas with Kremer. (*Id.* at ¶ 81.) Kremer also uses Twitter "to notify the public about topics such as legislation, upcoming legislative hearings, and government reports." (*Id.* at ¶ 82.) More generally, Kremer told a staff member that the Kremer Account "is a forum for constituents."[6] (*Id.* at ¶ 135.) In contrast, he has stated that the Kremer Account "is not for Dane County liberals to carry on conversations with me."[7] (*Id.* at ¶ 128.)

### 3. Defendant Nygren's Account

Nygren "operates and/or oversees the operation of" the Twitter account @rep89 ("Nygren Account"). (*Id.* at ¶ 5.) The Nygren Account was created in May 2009. The Nygren Account is registered to "John Nygren, 'Wisconsin State Representative, Joint Finance Co-Chair, Proudly Serving Marinette, Oconto, and Brown Counties.'" (*Id.* at ¶

---

[6] Kremer made this comment after OWN filed its lawsuit. (*Id.* at ¶ 135.)

[7] By "Dane County liberals," Kremer explained he is referencing "'the mind set for a region,' because 'Dane County is obviously a very liberal, socialist area, progressive area.'" (*Id.* at ¶ 129.)

30.)  As with Kremer's, the "@rep89" refers to Nygren's representation of the 89th Wisconsin State Assembly District.  Nygren's account's page links to Nygren's "official legislative website . . . established by the Wisconsin Legislative Technology Services Bureau."  (*Id.*)  The Nygren Account has over 2,900 followers.

The Nygren Account is primarily operated by Rep. Nygren, although members of Nygren's legislative office staff also play a role in its operation.[8]  Moreover, the staff operates the Nygren Account "on state time and with state computers."  (*Id.* at ¶ 73.)

Nygren created this Twitter Account to "communicate with his legislative constituents."  (*Id.* at ¶ 85.)  The Nygren Account tweets about policies, but also about topics of less policy-orientated nature "in part because as a state representative he wants his constituents to know him more fully."  (*Id.* at ¶ 88.)  Nygren also uses Twitter to notify the public about town hall meetings.

### 4. Defendant Vos's Account

Finally, Vos "operates and/or oversees the operation of" the Twitter account @repvos ("Vos Account").  (*Id.* at ¶ 6.)  The Vos Account was created in March 2009 and now has over 4,000 followers.  The Vos Account is "publicly registered to Robin Vos, 'State Representative representing parts of Racine County.'"  (*Id.* at ¶ 31.)

Vos created this account as "'a minority member of the Joint Committee on Finance looking for additional ways to get my views out to the public' and want[ing] 'the

---

[8] Defendants object to this fact because plaintiff relies in part on testimony from an individual who no longer works on Nygren's staff. (*Id.* at ¶ 71.)  Absent contrary evidence, however, this witness's personal knowledge still forms an adequate basis for the finding of fact.

opportunity to talk directly to people.'" (*Id.* at ¶ 91.)  The parties disagree over the Vos Account's current use and who operates it, but there is no dispute that Vos "created the Vos Account with the intention that anyone could follow it, whether or not they were a constituent of [Vos's] Assembly District," and that he "continues to use the Vos Account for both tweets about policy and personal tweets." (*Id.* at ¶¶ 95, 190.)  Unlike the Kremer and Nygen Accounts, however, the Vos Account does not contain a link to Vos's legislator homepage, a state-sponsored website.

Vos also has another account with the handle "@SpeakerVos," which he created after assuming the role of Speaker of the Wisconsin State Assembly.  That account "functions in Vos's 'role as Speaker . . . speaking on behalf of the Assembly and Republicans in general.'" (*Id.* at ¶ 93.)  Vos's legislator homepage contains a link to the @SpeakerVos Twitter Account, which did not block One Wisconsin Now on Twitter.

### D. Defendants Block OWN's Access to Their Twitter Accounts

OWN first followed the Vos Account in 2011, the Nygren Account in September 2013, and the Kremer Account in April 2015.  (*Id.* at ¶¶ 44, 50, 56.) In 2017, all three defendants blocked the OWN Account from their respective Twitter Accounts as discussed above.[9]  While defendants have offered various reasons for blocking the OWN Account, there is no dispute that each defendant personally made the decision to do so.  (*Id.* at ¶¶ 126, 162, 177.)  Kremer claims he blocked the OWN Account "to stop spamming, stop

---

[9] In June 2017, OWN noticed that its Twitter account was blocked by the Kremer Account. (*Id.* at ¶ 124.) Nygren blocked the OWN Account on or about August 9, 2017.  (*Id.* at ¶ 126.) Vos blocked the OWN Account sometime before March 16, 2017. (*Id.* at ¶ 127.)

the posting of tweets unrelated to the topic of the original tweets he posted, and to stop tweets of an inappropriate and unprofessional nature." (*Id.* at ¶¶ 180.) Nygren "claims to have blocked OWN . . . for '[c]rude comments on Wisconsin politics'" that included "numerous vulgarities," such as "personal attacks, not necessarily against [Nygren] but other figures." (*Id.* at ¶¶ 152, 154.) Finally, while Vos does not remember why he blocked the OWN Account (*id.* at ¶ 162) his staff noted that the only appropriate grounds to block another Twitter user was "the use of vulgarity and profanity." (*Id.* at ¶ 176.)

All three defendants have blocked other Twitter accounts besides the OWN Account from their respective Twitter Accounts, but none have adopted official policies on blocking other Twitter users. (*Id.* at ¶¶ 109, 158, 161.) Not including the OWN Account, Kremer has blocked five Twitter accounts; Nygren has blocked 37 Twitter accounts; and Vos has blocked three Twitter accounts. *Id.*

## OPINION

The court may grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A factual dispute can preclude summary judgment, but only if the "facts might affect the outcome of the suit under the governing law." *Id.* at 248. The party moving for summary judgment carries the initial burden of showing that there is no genuine issue of material fact that that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

14

Plaintiff One Wisconsin Now claims defendants engaged in unconstitutional content or viewpoint discrimination when they blocked its Twitter account, thereby removing plaintiff's access to the interactive portion of defendants' respective Twitter accounts. Plaintiff's claim presents a novel question of law for this court: is the interactive portion of a government official's Twitter account a designated public forum?

While there is no settled law on whether a government actor's social media account is a designated public forum, two federal district courts have now held that government officials' social media accounts can constitute public forums. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018); *Davison v. Loudon County Bd. of Supervisors*, 267 F. Supp. 3d 702 (E.D. Va. 2017). More recently, the Fourth Circuit became the first federal court of appeals to review this question in upholding the Eastern District of Virginia's *Davison* decision, similarly finding that the interactive portion of a local government official's Facebook page constituted a public forum. *Davison v. Randall*, No. 17-2002, 2019 WL 114012 (4th Cir. Jan. 7, 2019). Finally, the Supreme Court has also acknowledged that social media is a "vast democratic forum" analogous to traditional public forums, such as parks. *See Packingham v. North Carolina,* 137 S. Ct. 1730, 1735–36 (2017).

Relying on the three-step analysis set forth in these decisions, the court similarly finds here that: (1) defendants acted under color of state law in creating and maintaining their respective Twitter accounts in their capacity as members of the Wisconsin State Assembly; (2) the interactive portion of defendants' Twitter accounts are designated public forums; and (3) defendants engaged in content-based discrimination when they blocked

the plaintiff's Twitter account. As a result, plaintiff is entitled to a grant of summary judgment on its liability claims.

## I. State Actor Requirement

As an initial matter, to state a claim under § 1983, a plaintiff must establish that the defendant acted under color of state law. *Cruz v. Safford*, 579 F.3d 840, 843 (7th Cir. 2009). In general, a public employee "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). A court may also find action by a private actor to be under color of state law if there is a "sufficient nexus between the state and the private actor" to show that "the deprivation committed by the private actor is 'fairly attributable to the state.'" *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). The sufficient nexus is determined based on the totality of the circumstances. *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 614–15 (1989).

Defendants contend that the act of blocking plaintiff on Twitter was not state action because there is no Wisconsin law that specifically grants them the power to block Twitter users. (Defs.' Opp'n (dkt. #47) 4.) Defendants' interpretation of the color of state law test is unworkable, narrow, and, simply put, silly. The law does not and has never required that a state action be specifically authorized by statute before being subject to examination. If it did, the force of the protection promised by the First Amendment and the Bill of Rights would be gutted. Instead, for individuals acting in a public capacity, the color of state law test examines whether the defendant (1) explicitly or implicitly invoked state

authority or (2) "could not have acted in violation of the plaintiff's constitutional rights but for his state authority." *Luce v. Town of Campbell*, 113 F. Supp. 3d 1002, 1016 (W.D. Wis. 2015), *rev'd in part on other grounds*, 872 F.3d 512 (7th Cir. 2017). Furthermore, to find whether a private actor is acting under color of state law, the test is whether there is a "sufficient nexus between the state and the private actor" to show that "the deprivation committed by the private actor is 'fairly attributable to the state.'" *Marian Catholic High Sch.*, 852 F.3d at 696.

Plaintiff argues that defendants acted under color of state law when they created and operated their Twitter accounts. To support its argument, plaintiff cites both the *Davison* and *Knight* district court decisions. Although *Knight* held that the operation of the defendant government actor's social media account, including the power to block other users, constituted state action, it did not engage in a separate color of state law analysis. *Id.* at 567–68. Thus, for purposes of the color of state law analysis, the court will focus on the analysis in *Davison*.

Applying totality of the circumstances test approved by the Supreme Court in *Skinner*, the *Davison* court found that a government official acted under color of state law when she created and operated a Facebook page. *Id.* at 711–14. While the *Davison* court noted that several aspects of the defendant's social media account seemed "entirely private,"[10] these factors were substantially outweighed by factors suggesting the creation

---

[10] Specifically, the court acknowledged that: "Defendant's enumerated duties do not include the maintenance of a social media website. The website in question will not revert to the County when Defendant leaves office. Moreover, Defendant does not use county-issued electronic devices to post to the 'Chair Phyllis J. Randall' Facebook page, and much of Defendant's social media activity takes place outside of both her office and normal working hours." *Davison*, 267 F. Supp. 3d at 712.

and operation of the social media page constituted state action. *Id.* at 712. Specifically, the *Davison* court found the following dispositive: (1) the social media page's obvious public, not private, purpose (defendant's election to public office and subsequent use as "a tool of governance"); (2) defendant's use of government resources, including government employees, to maintain the page; (3) the connection between defendant's official newsletters and the page; and (4) defendant's efforts to "swathe" the page "in the trappings of her office." *Id.* at 712–14.

As to the final factor in particular, *Davison* identified at least eight ways in which the social media page was bound up with the trappings of her office:

> (1) the title of the page includes Defendant's title; (2) the page is categorized as that of a government official; (3) the page lists as contact information Defendant's official County email address and the telephone number of Defendant's County office; (4) the page includes the web address of Defendant's official County website; (5) many—perhaps most—of the posts are expressly addressed to 'Loudoun,' Defendant's constituents; (6) Defendant has submitted posts on behalf of the Loudoun County Board of Supervisors as a whole; (7) Defendant has asked her constituents to use the page as a channel for 'back and forth constituent conversations'; and (8) the content posted has a strong tendency toward matters related to Defendant's office.

*Id.* at 714.

In affirming the Eastern District of Virginia's decision in *Davison*, the Fourth Circuit also identified a number of factors to be considered when determining whether purportedly private action bears a sufficiently close nexus with the State to constitute action under color of state law. No. 17-2002, 2019 WL 114012, at *7. These factors include: (1) whether defendant's actions are linked to events arising out of his or her official status; (2)

whether defendant's "status" as a public official enabled defendant to act in a manner that a private citizen could not have done; (3) whether the defendant's action occurred in the course of performing an actual or apparent duty of his or her office; and (4) whether defendant used the power and prestige of his or her state office to damage the plaintiff. *Id.* After analyzing the totality of the circumstances, the Fourth Circuit agreed with the district court that on balance the defendant had acted under color of state law. *Id.*

As in *Knight* and *Davison*, there are a few facts in this record that might support finding the defendants' creation and operation of their Twitter accounts was private, rather than public, action: (1) creating the Twitter accounts was not one of the defendants' enumerated duties; (2) the Twitter page will not become state property when the defendants leave office; and (3) some of the defendants' social media activity likely takes place outside of normal working hours. However, as in those cases, there are far more factors that support finding defendants created and operated their respective Twitter accounts under the color of state law under the totality of the circumstances test, therefore, plaintiff prevails in establishing state action. To illustrate this, the court will set forth the record evidence as to Kremer's and Nygren's Twitter accounts together and then turn to Vos's account given its arguably unique facts.

## A. Kremer and Nygren's Twitter Accounts

There is little question that Kremer and Nygren's accounts rely on "the power and prestige of . . . state office" and were "created and administered . . . to perform actual or apparent duties of [Kremer and Nygren's] office[s]." *Davison*, 2019 WL 114012 at *7. As plaintiff notes, Kremer and Nygren's Twitter accounts are intertwined with their public

responsibilities:  Kremer and Nygren created their accounts while in office; both defendants use their accounts to share information on legislative matters, policies, political appearances, and events; and both use government resources to maintain their Twitter accounts.

Also weighing in favor of finding state action is the fact that Kremer's and Nygren's accounts are "swathed in the trappings of their office." *Davidson*, 267 F. Supp. 3d at 714. Defendant Kremer's account, is registered to "Rep. Jesse Kremer," described as the "Official account for Wisconsin State Representative Jesse Kremer (R-Kewaskum)," and identified by the handle "@RepJesseeKremer."  Similarly, Kremer's account features a picture of the Wisconsin state capitol accompanied by "images of the word 'State Representative' and of the American flag."  Unlike his separately maintained personal account ("@JesseforWI"), Kremer's Twitter account also includes a link to his official legislative website.  As for Nygren's account, identified by the handle "rep89," it describes him as a "Wisconsin State Representative, Joint Finance Co-Chair, Proudly Serving Marinette, Oconto, and Brown Counties."  Nygren's account also features a picture of several people, including Nygren, standing in front of a sign for "Wisconsin State Representative John Nygren."  Finally, like Kremer's account, Nygren's account also links to his official legislative website.

## B.  Vos's Twitter Account

In fairness, the facts of record on summary judgment as to defendant Vos's Twitter account do not as cslearly indicate that it was created and operated under color of state law.  Two, additional issues complicate the analysis for the Vos account:  (1) whether it utilizes  government  resources  in  its  operation  and  (2)  the  existence  of  Vos's

"@SpeakerVos" account.

Beginning with the existence of the "@SpeakerVos" account, Vos created it after he was elected Speaker of the Wisconsin State Assembly and the description of the "@SpeakerVos" account suggests it exists for Vos to speak on behalf of Republican representatives in his capacity as Assembly Speaker, not solely as a state representative, particularly since Vos still uses the "@repvos" account to communicate with the public as a state representative. Furthermore, while the parties disagree on the extent of Vos's use of state resources to maintain his original representative account, it is still sufficiently linked to public circumstances and swathed in the trappings of his office to constitute state action under a totality of the circumstances test.

First, Vos created and continues to use his "@repvos" for public purposes. Specifically, it is undisputed that Vos created the account "because he was 'a minority member of the Joint Committee on Finance looking for additional ways to get my views out to the public' and wanted 'the opportunity to talk directly to people.'" (Pl.'s Opening Br. (dkt. #28) 10.) And he "continues to use the Vos Account for both tweets about policy and personal tweets" to constituents. (*Id.* at 11.)

Second, the "@repvos" account is heavily "swathed" in the trappings of Vos's office. The account is registered to "Robin Vos, 'State Representative representing parts of Racine County.'" (*Id.* at 10.) The account features an image of uniformed individuals and an American flag. These two facts alone show that the account still represents Vos in his official, not personal, capacity.

Finally, with or without the existence of Vos's speaker account, the essential purpose

and function of Vos's account remains essentially the same as Kremer's and Nygren's Twitter Accounts: to perform actual and apparent duties as state assemblyperson using the power and prestige of that office to communicate legislative matters and other issues with the public. Therefore, the court find that Vos acted under color of state law when he created the account and continues to act under color of state law when operating the account.

## II. Designated Public Forums

The court must next decide whether the *interactive* components of defendants' Twitter accounts are designated public forums.[11] Under the First Amendment, members of the public retain varying degrees of free speech rights on government property. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). The traditional illustration of speech in these public forums is assembly or communication on public streets or in public parks. *Id.* As noted, however, the Supreme Court has extended public speech protection to less traditional, designated public forums, defined as "locations or channels of communication that the government opens up for use by the public for expressive activity." *Surity v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011).

A government cannot create a designated public forum "by inaction or by permitting limited discourse." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015). Rather, the government must intentionally open "a nontraditional forum

---

[11] Plaintiff narrows its challenge to only the interactive components of Twitter, which makes sense in light of the district court's extensive discussion in *Knight First Amendment Inst.*, 302 F. Supp. 3d at 573.

for public discourse." *Id.* (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 778, 802 (1985)). To determine whether a government has intentionally created a designated forum, courts examine (1) the "policy and practice of the government" and (2) "the nature of the property and its compatibility with expressive activity." *Id.* Given the nature of Twitter and its compatibility with expressive activity, now highlighted by the Supreme Court's decision in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the interactive portions of defendants' respective Twitter accounts plainly constitute designated public forums. *Id.* at 1736; *see also Knight First Amendment Inst.*, 302 F. Supp. 3d at 575 (finding that "[t]he interactivity of Twitter is one of its defining characteristics" and similarly concluding that the interactive portion constitutes a designated public forum); *Davison*, 2019 WL 114012, *8-9 (concluding that the interactive component of a government official's Facebook page constituted a public forum because it was "intentionally opened . . . for public discourse" and was "compatible with expressive activity").

Indeed, in *Packingham*, the United States Supreme Court suggested the internet generally, and particularly social media, is a new space for public discourse analogous to traditional public forums:

> A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen more . . . . A basic rule, for example, is that street or park is a quintessential forum for the exercise of First Amendment rights . . . . While in the past there may have been some difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general . . . and social media in particular.

137 S. Ct. at 1735–36.  In particular, the Supreme Court observed that when one creates a social media account, one subscribes to the fundamental purpose of social media: to create "a digital space for the exchange of ideas and information." *Davidson*, 267 F. Supp. 3d at 716.  Here, there can be no reasonable dispute that defendants intentionally created the interactive social media accounts at issue in order to communicate with members of the public about news and information related to their roles as public officials, and are continuing to operate them as such.

Nonetheless, defendants argue at summary judgment that by creating a Twitter account, they did not intentionally create designated public forums because there was no "policy" in place to do so.  Rather, defendants suggest, the Twitter accounts were intended only as a way for defendants "to get their messages out to their constituents."  (Defs.' Opp'n (dkt. #47) 16.)  Even if this is the only reason the defendants created their Twitter account, they have not taken any steps to limit access to their accounts to their constituents, nor have they limited access by the general public, save perhaps for a few individuals.  Regardless, Twitter remains a social media platform, and interaction remains a key component of this platform.  If defendants truly had no intention to create a space for public interaction and discourse, they would not have created public Twitter accounts in the first place.  Instead, they could simply broadcast their views, schedules and other information, for example, through a *non-interactive* blog.  Having opted to create a Twitter account, however, and benefit from its broad, public reach, defendants cannot now divorce themselves from its First Amendment implications and responsibilities as state actors.

Defendants offer two other arguments against finding a designated public forum:

(1) because Twitter is a private corporation, the accounts are not public property, and thus cannot be a public forum; and (2) defendants' tweets constitute government speech. Neither argument holds much merit, for the same reasons recently articulated the Fourth Circuit. First, the private property claim fails because, as plaintiffs rightly note, public forums can be found on public or private property. *See, e.g.*, *Cornelius*, *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 778, 801 (1985) (providing a "speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns."); *Davison*, 2019 WL 114012, at *9 ("[T]he Supreme Court never has circumscribed forum analysis solely to government-owned property.").

Second, as for the government speech claim, even plaintiff acknowledges that the defendants' *own* tweets may constitute government speech, but this does not mean that *all* speech associated with their Twitter accounts is government speech. Defendants attempt to side-step this issue by simply stating that the "more proper conclusion is to treat a state representative's entire Twitter page as a whole—and consider it government speech." (Defs.' Opp'n (dkt. #47) 20.) However, defendants fail to provide any reason for requiring such limited analysis. Moreover, as detailed in plaintiff's expert's report, it is easy to distinguish the parts of Twitter that reflect the defendants' respective views (e.g., their own tweets and reactions to other tweets, from the actions of other citizens on their feeds). (Culver Rept. (dkt. #26) ¶¶ 27-28.) Accordingly, the court agrees with the district court in *Knight* and the Fourth Circuit in *Davison* finding that the interactive portion is severable from the rest of the Twitter account and not subject to the government speech exception. *See Davison*, 2019 WL 114012, at *11 (rejecting the government speech argument because

the "interactive component of the Chair's Facebook Page—the portion of the middle column in which the public can post comments, reply to posts, and 'like' comments and posts—is materially different" than the portion of the page containing plaintiff's own posts); *Knight First Amendment Inst.*, 302 F. Supp. 3d at 572 (holding the content of Trump's tweets is not amenable to forum analysis because it is government speech, but finding "[t]he same cannot be said . . . of the interactive space for replies and retweets created by each tweet sent by the @realDonaldTrump account").[12]

For all of these reasons, the court concludes that the interactive portions of the defendants' respective Twitter accounts constitute designated public forums.

### III. Content-Based Discrimination

Finally, when the government creates a designated public forum, there are limited circumstances in which it *can* restrict speech. *Perry Educ. Assn.*, 460 U.S. at 45–46 (noting that designated public forums are subject to the same standards as traditional public forums). Specifically, the government can impose "reasonable time, place and manner regulations" on speech within the forum. *Id.* at 46. What the government cannot do is exclude speech *based on its content*, unless it can meet that the extraordinarily high burden

---

[12] As described above, defendants filed a motion to supplement the record this week, seeking to add an undisputed fact that a Twitter user can delete his or her own tweet, which in turn would delete the replies by other Twitter users. (Dkt. #77.) The court infers that this proposed supplemental fact is material to defendants' government speech argument. The court is unpersuaded, however, that the availability of this delete function could give rise to a reasonable inference that a Twitter user endorses the position of replies to his or her tweets. *See Price v. City of New York*, No. 15 CIV. 5871 (KPF), 2018 WL 3117507, at *14 (S.D.N.Y. June 25, 2018) ("The City Defendants cannot credibly suggest that the public would confuse Plaintiff's posts criticizing the City as being the City's own speech.").

of proving exclusion is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that interests." *Id.* at 45. Said more succinctly, the government's reason for content-based restrictions must satisfy strict scrutiny. *Id.*

Here, plaintiff argues that by blocking its Twitter account, defendants impermissibly restricted its speech because of its viewpoint and content. Because there is a question as to what specific action motivated each defendant to block OWN from their Twitter accounts, the court opts to consider plaintiff's content-based challenge. In *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011), the Seventh Circuit found an impermissible content-based restriction where a mayor blocked an individual from speaking about an issue at a city council meeting because of something the speaker said two days before the meeting. *Id.* at 872. In particular, the Seventh Circuit found the mayor's action was content-based, rather than content-neutral, because he "excluded a speaker within the class to which the designated public forum was available." *Id.* at 870. In addition, the court found the mayor's actions were not a reasonable time, place, or manner restriction because (1) the plaintiff "approached the microphone at the appropriate time," and (2) there was no indication the plaintiff's speech would be inappropriate. *Id.* at 871. Finally, the court concluded the mayor's reason for employing the content-based restrict (the plaintiff's prior speech) did not satisfy strict scrutiny and was thus an impermissible content-based restriction. *Id.* at 872.

Like the plaintiff in *Surita*, defendants in this case blocked plaintiff because of its prior speech or identity. Indeed, all three defendants indicated, either directly or indirectly, that they do not approve of plaintiff's liberal perspective. For instance, Kremer testified

that his Twitter feed is not "for Dane County liberals to carry on conversations with me," and while Nygren claims he blocked plaintiff for its "crude comments on Wisconsin politics," he was unable to identify any, actual "crude" comments. (Pl.'s Opening Br. (dkt. #28) 32; Pl.'s Reply to Pl.'s PFOFs (dkt. #49) ¶ 155 ("Nygren has no record or recollection of any particular offensive comments made by OWN.").) For his part, Vos offers no speech-related reason for blocking OWN; instead, he simply avers that he cannot recall the reason. Given the context, however, the only reasonable inference is that Vos blocked OWN because of its prior activity on his Twitter page. Furthermore, all three defendants have only blocked a select number of Twitter accounts, supporting plaintiff's assertion that defendants selectively blocked plaintiff for a specific reason and not as a matter of happenstance.

Even if the reason for blocking OWN were not obviously based on content, *defendants'* bear the burden to come forward with a compelling state interest for blocking plaintiff, *Perry Educ. Assn.*, 460 U.S. at 45–46, and that they have wholly failed to do. In fact, as plaintiff notes, defendants have articulated no reason for blocking plaintiff at all, except by vague innuendo or by claiming that they must have had a valid reason but can no longer remember why they did so. Indeed, in their opposition brief, defendants simply declined to respond to plaintiff's content-based challenge, arguing that the government speech doctrine applies to the Twitter accounts as a whole. (Defs.' Opp'n (dkt. #47) 33.)[13] For these reasons, the court concludes that defendants' content-based restrictions are

---

[13] Even if defendants had articulated a reason for blocking OWN from their respective Twitter accounts, defendants also failed to meet their burden by showing why blocking -- as opposed to muting, for example -- is the least restrictive means to achieve their undefined goal.

impermissible and in violation of plaintiff's First Amendment rights.

## IV. Relief

Having found that defendants violated plaintiff's First Amendment rights in blocking it from defendants' respective Twitter accounts, the only remaining question is the appropriate relief. In its complaint, plaintiff seeks "a permanent injunction requiring Defendants to unblock One Wisconsin Now from Defendants' Accounts, and prohibiting Defendants from blocking One Wisconsin Now or others from the Accounts." (Compl. (dkt. #1) p.18.) This request, for the most part, appears reasonable, though the court would lack authority to prohibit defendants from blocking *others* from their accounts for legitimate reasons that do not implicate the First Amendment.

Accordingly, the court will direct the parties to submit short briefs on the remaining issue of relief. Plaintiff's brief is due January 30, 2019, with defendants' response due February 8, 2019. In addition, the briefing deadlines remain with respect to defendant Kremer's recent motion to dismiss because he is no longer a member of the Wisconsin State Assembly.[14] Finally, the parties should hold open the first day of trial, March 11, 2019, should the court decide that any argument or testimony is necessary to decide on an

---

[14] In plaintiff's opposition to defendants' motion for extension to respond to plaintiff's motion for summary judgment, OWN represented that Kremer had announced his intention to not seek re-election to his position as a state representative in November 2018 (Pl.'s Opp'n (dkt. #35) 1); and it appears from local news reports that another individual was elected to represent the 59th Assembly District. *See* Sara Razner, *Fond du Lac, Dodge County Results*, FDL Reporter, Nov. 6, 2019, https://www.fdlreporter.com/story/news/2018/11/06/wisconsin-elections-rep-jeremy-thiesfeldt-wins-52nd-assembly-seat/1909148002/ (noting Timothy Ramthun won the election). As such, any requested relief against Kremer would now appear to be moot. The court notes that defendants have recently filed a motion to dismiss plaintiff's claim against Kremer as moot. (Dkt. #71.) The court will take up that motion in a later opinion and order.

appropriate remedy.

## ORDER

For the reasons state above, IT IS ORDERED that:

1) Plaintiff One Wisconsin Now's motion for summary judgment (dkt. #27) is GRANTED.

2) Defendants Jesse Kremer, John Nygren and Robin Vos's motion for summary judgment (dkt. #56) is DENIED.

3) Defendants' motion to strike plaintiff's expert (dkt. #38) is GRANTED IN PART AND DENIED IN PART as set forth above.

4) Plaintiff's motion to file a sur-reply brief (dkt. #69) is GRANTED.

5) Defendants' motion to strike plaintiff's jury demand (dkt. #74) is DENIED AS MOOT.

6) Defendants' motion to supplement their motion for summary judgment (dkt. #77) is GRANTED.

7) All remaining deadlines in this case are STRUCK, except for the briefing schedule on relief set forth above and defendant Kremer's motion to dismiss previously set by the court. The parties are also to hold open March 11, 2019, for possible argument and presentation of evidence as to the appropriate remedy, if necessary.

Entered this 18th day of January, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge